## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| GEYER SIGNAL, INC. and KEVIN KISSNER, | Civil No. 11-321 (JRT/LIB) |
| Plaintiffs, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| MINNESOTA DEPARTMENT OF TRANSPORTATION, MARY PRESCOTT *in her capacity as Acting Director of the Office of Civil Rights*, and CHARLES A. ZELLE, | |
| Defendants, | |
| and | |
| UNITED STATES OF AMERICA, UNITED STATES DEPARTMENT OF TRANSPORTATION, and FEDERAL HIGHWAY ADMINISTRATION | |
| Intervenor Defendants. | |

Julie A. Doherty **FABYANSKE WESTRA HART & THOMSON, PA**, 800 LaSalle Avenue, Suite 1900, Minneapolis, MN 55402; and Hannah R. Stein, **NIERENBERG EMPLOYMENT LAW, PLLC**, 222 South Ninth Street, Suite 1600, Minneapolis, MN 55402, for plaintiffs.

Andrew G. Braniff, **UNITED STATES DEPARTMENT OF JUSTICE, CIVIL RIGHTS DIVISION**, 950 Pennsylvania Avenue Northwest, Room 4520, Washington, DC 20530; and Jeffrey Scott Thompson and Richard L. Varco, Jr., **MINNESOTA ATTORNEY GENERAL'S OFFICE**, 445 Minnesota Street, Suite 1800, Saint Paul, MN 55101, for defendants

Minnesota Department of Transportation, Mary Prescott and Charles A. Zelle.

Andrew G. Braniff, **UNITED STATES DEPARTMENT OF JUSTICE, CIVIL RIGHTS DIVISION**, 950 Pennsylvania Avenue Northwest, Room 4520, Washington, DC  20530, for defendants United States of America, United States Department of Transportation, and Federal Highway Administration.

Geyer Signal, Inc. ("Geyer Signal") and  Kevin Kissner (collectively, "Plaintiffs") bring this action against the Minnesota Department of Transportation, Alex Tittle, in his capacity as Interim Director of the Office of Civil Rights,[1] and Charles A. Zelle as Commissioner of Transportation, (collectively, "State Defendants" or "MnDOT"). Kissner is a white male and owns Geyer Signal, a small traffic control business. Plaintiffs challenge MnDOT's implementation of the United States Department of Transportation's ("USDOT") Disadvantaged Business Enterprise ("DBE") Program, which requires that a portion of federal highway construction funds be paid to small businesses owned and controlled by socially and economically disadvantaged individuals, as violative of the Equal Protection Clause.  Plaintiffs also bring claims for violations of various federal statutes based on the allegation that the DBE Program unfairly discriminates against Geyer Signal because of its white male ownership.  The United States of America, USDOT, and the Federal Highway Administration (collectively, "the Federal Defendants") intervened.  The Federal Defendants move for summary judgment and the State Defendants move to dismiss, or in the alternative for summary judgment,

---

[1] The lawsuit names Mary Prescott.  On May 22, 2013, Alex Tittle replaced Mary Prescott as the Interim Director of the Office of Civil Rights.  Prescott is automatically substituted as the defendant in this matter.  Fed R. Civ. P. 25(d).

arguing that the DBE Program on its face and as implemented by MnDOT is constitutional. Because the Court concludes that Plaintiffs have raised no genuine issue of material fact with respect to the constitutionality of the DBE Program facially or as applied, it will grant Defendants' motions in their entirety.

## BACKGROUND

### I.    THE DBE PROGRAM

Congress first enacted the DBE Program in 1982. *See* Surface Transportation Assistance Act of 1982, Pub. L. No. 97-424, § 105(f), 96 Stat. 2097, 2100. Congress has reauthorized the DBE Program numerous times over the past three decades, most recently in 2012, while the present lawsuit was pending. Moving Ahead for Progress in the 21st Century Act, Pub. L. No. 112-141, § 1101(b), 126 Stat. 405 (2012). The DBE Program is implemented through federal regulations contained in 49 C.F.R. Part 26. In each reauthorization of the DBE Program, Congress has set an aspirational goal that USDOT spend at least ten percent of its funds with small businesses owned and controlled by "socially and economically disadvantaged individuals." *See, e.g.*, Pub. L. No. 112-141, § 1101(b)(3). Rather than implementing a nationwide DBE Program, the regulations delegate to each state that accepts federal transportation funds the responsibility to implement and administer a DBE Program tailored to local needs.

To qualify as a DBE a firm must be a small business as defined by Small Business Administration Standards. 49 C.F.R. § 26.65(a); 13 C.F.R. § 121.201. Additionally, a

firm's average gross annual receipts over the firm's previous three fiscal years must not exceed $22.41 million.  49 C.F.R. § 26.65(b).  The business must also be one

> (1) which is at least 51 per centum owned by one or more socially and economically disadvantaged individuals; or, in the case of any publicly owned business, at least 51 per centum of the stock of which is owned by one or more socially and economically disadvantaged individuals; and

> (2) whose management and daily business operations are controlled by one or more of such individuals.

15 U.S.C. § 637(d)(3)(C).

Socially disadvantaged individuals are defined as "those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities."  15 U.S.C. § 637(a)(5).  Economically disadvantaged individuals are "socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same business area who are not socially disadvantaged."  15 U.S.C. § 637(a)(6)(A).

The DBE Program creates a rebuttable presumption that Black Americans, Hispanic Americans, Native Americans, Asian-Pacific Americans, Subcontinent Asian Americans, and women are socially and economically disadvantaged.  49 C.F.R. § 26.67(a).  To obtain DBE status, these individuals must submit an affidavit attesting to the fact that "each presumptively disadvantaged owner is, in fact, socially and economically disadvantaged."  49 C.F.R. § 26.67(a)(1).  Each owner must also certify that his or her personal net worth does not exceed $1.32 million.  49 C.F.R. § 26.67(a)(2).

If an owner's personal net worth exceeds this amount, the presumption of economic disadvantage is rebutted. 49 C.F.R. § 26.67(b)(1). Additionally, recipients of federal funds are empowered to hold a proceeding if the recipient has "a reasonable basis to believe that an individual who is a member of one of the designated groups is not, in fact, socially and/or economically disadvantaged." 49 C.F.R. § 26.67(b)(2)-(3).

Individuals that own firms who are not from categories entitling them to a presumption of social and economic disadvantage may apply for DBE certification. 49 C.F.R. § 26.67(d). Recipients of federal funds must make determinations about such individuals on a case-by-case basis and "the applicant firm has the burden of demonstrating to [the recipient], by a preponderance of the evidence, that the individuals who own and control [the firm] are socially and economically disadvantaged." *Id.*

The Program is aimed not just at DBEs, but also at encouraging the participation of small businesses in general. As such, recipients of federal funds are required to include in their DBE Programs "an element to structure contracting requirements to facilitate competition by small business concerns, taking all reasonable steps to eliminate obstacles to their participation, including unnecessary and unjustified bundling of contract requirements that may preclude small business participation in procurements as prime contractors or subcontractors." 49 C.F.R. § 26.39(a). Such efforts can include arranging race-neutral set asides on prime contracts in a stated amount and ensuring that contracts include work in sizes feasible for small business to accomplish. 49 C.F.R. § 26.39(b).

### A.      The Program's Operation

#### 1.  Goal Setting

Recipients of federal transportation funds are required to set an annual aspirational goal for DBE participation that must be based upon evidence of available DBEs and the level of participation that would be expected of DBEs in the absence of discrimination. 49 C.F.R. § 26.45(a)-(b).  Specifically, federal regulations provide that:

> Your overall goal must be based on demonstrable evidence of the availability of ready, willing and able DBEs relative to all businesses ready, willing and able to participate on your DOT-assisted contracts (hereafter, the "relative availability of DBEs").  The goal must reflect your determination of the level of DBE participation you would expect absent the effects of discrimination.  You cannot simply rely on either the 10 percent national goal, your previous overall goal or past DBE participation rates in your program without reference to the relative availability of DBEs in your market.

49 C.F.R. § 26.45(b).

In setting its annual goals, recipients must follow the federally mandated two-step process.  In step one, recipients are required to "determin[e] a base figure for the relative availability of DBEs."  49 C.F.R. § 26.45(c).  The regulations describe use of DBE directories and Census Bureau Data, bidders' lists, data from a disparity study, or the goal of another substantially similar DOT recipient, as a non-exhaustive list of examples of approaches that recipients may use in determining a base figure.  *Id.*  In step two, recipients must adjust their base figure if necessary "to reflect the State's determination that more DBEs would be participating absent the effects of discrimination, including race-related barriers to entry."  *Sherbrooke Turf, Inc. v. Minn. Dep't of Transp.*, 345 F.3d

- 6 -

964, 971 (8th Cir. 2003) (citing 49 C.F.R. 26.45(d)).  Any adjustment made "to account for the continuing effects of past discrimination . . . must be based on demonstrable evidence that is logically and directly related to the effect for which the adjustment is sought." 49 C.F.R. 26.45(d).  After setting its goal, recipients are required to submit the goal and a description of the methodology used to arrive at the goal, to USDOT administration.  49 C.F.R. § 26.45(f).  If the USDOT determines that the recipient's "overall goal has not been correctly calculated" or that the "method for calculating goals is inadequate" it may adjust the recipient's goal, or require that the recipient do so.  49 C.F.R. § 26.45(f)(4).  Recipients are not allowed to subdivide their annual goals into "group-specific goals."  49 C.F.R. § 26.45(h).  Rather, their annual goals "must provide for participation by all certified DBEs."  *Id.*

### 2.  Goal Implementation

After setting its annual goal, a recipient is required to "meet the maximum feasible portion of [its] overall goal by using race-neutral means of facilitating DBE participation."  49 C.F.R. § 26.51(a).  DBE participation is race-neutral if a DBE wins a prime contract through normal competitive procedures, is awarded a subcontract on a project that has no DBE goal, or wins a subcontract on a project with a DBE goal where the prime contractor did not consider its DBE status in awarding the subcontract.  *Id.* Federal regulations provide a long list of non-exhaustive race-neutral means that may be used by recipients in meeting their annual goal, including arranging the solicitation, presentation, quantities and specifications of bids to make the bidding process more

accessible to DBEs, providing assistance to DBEs to overcome barriers such as inability to obtain bonding or financing, providing technical assistance, ensuring that information about projects reaches DBEs, providing business support services, and establishing programs to assist new start-up firms.  49 C.F.R. § 26.51(b).  A recipient's race-neutral means are subject to federal approval and must be submitted to USDOT along with the recipient's overall goal.  49 C.F.R. § 26.51(c).

If a recipient determines that it will be unable to achieve its goal solely through the use of race-neutral means, it must establish contract goals on USDOT-assisted contracts that have subcontracting possibilities to meet the remainder of its overall goal.  49 C.F.R. § 26.51(d), (e)(1).  With respect to contract goals, federal regulations allow recipients great flexibility.  Recipients are not required to set a contract goal for every USDOT-assisted contract, nor is the percentage level for each contract goal required to meet the overall goal.  49 C.F.R. § 26.51(e)(2).  Percentage goals for each contract are to be set based upon such factors as "the type of work involved, the location of the work, and the availability of DBEs for the work of the particular contract."  *Id.*  Recipients are required to adjust their use of contract goals throughout the fiscal year, to ensure that the maximum amount of the overall goal is met through race-neutral means, and that use of contract goals does not result in attaining DBE participation beyond the overall goal.  49 C.F.R. § 26.51(f).

Goals set pursuant to the DBE Program are only aspirational.  A recipient "cannot be penalized, or treated by [USDOT] as being in noncompliance" with the DBE Program because a recipient's "DBE participation falls short of [its] overall goal," unless the

recipient has not administered its DBE Program in good faith.   49 C.F.R. § 26.47(a).

Similarly, prime contractors are not required to meet DBE participation goals on a

contract for which a specific goal was set, provided they made good faith efforts to meet

the goal.   49 C.F.R. § 26.53(a).

The federal regulations provide guidance on what constitute good faith efforts that

must be demonstrated by prime contractors bidding on projects for which a specific

contract goal has been set.   A prime contractor can meet the good faith requirement in

one of two ways.   "First, the bidder can meet the goal, documenting commitments for

participation by DBE firms sufficient for this purpose."   49 C.F.R., pt. 26, App. A, I.   If,

however, the prime contractor is unable to meet the contract goal "the bidder can

document adequate good faith efforts.   This means that the bidder must show that it took

all necessary and reasonable steps to achieve a DBE goal . . . which, by their scope,

intensity, and appropriateness to the objective, could reasonably be expected to obtain

sufficient DBE participation, even if they were not fully successful."   *Id.*   The efforts

taken by the bidder "should be those that one could reasonably expect a bidder to take if

the bidder were actively and aggressively trying to obtain DBE participation sufficient to

meet the DBE contract goal.   Mere pro forma efforts are not good faith efforts to meet the

DBE contract requirements."   49 C.F.R., pt. 26, App. A, II.   The regulations then list

examples of good faith efforts such as (1) soliciting bids from all certified DBEs who

have the capability to perform the work on the contract through reasonable and available

means; (2) breaking up the contract work into economically feasible units to facilitate

DBE participation; (3) providing interested and available DBEs with adequate

information about the contract; (4) negotiating in good faith with DBEs; and (5) making efforts to assist DBEs in obtaining credit or meeting bonding requirements.  49 C.F.R., pt. 26, App. A, IV.  Specifically, "the fact that there may be some additional costs involved in finding and using DBEs is not in itself sufficient reason for a bidder's failure to meet the contract DBE goal, as long as such costs are reasonable."  49 C.F.R., pt. 26, App. A, IV, D(2).  "Prime contractors are not, however, required to accept higher quotes from DBEs if the price difference is excessive or unreasonable."  *Id.*

### 3.  Local Conditions

To increase local flexibility in Program implementation, the federal regulations allow recipients to apply for exemptions or waivers from almost any of the Program's requirements.  49 C.F.R. § 26.15.  Specifically, recipients may obtain waivers of the provisions pertaining to overall goals, contract goals, or good faith efforts.  49 C.F.R. § 26.15(b).  "Program waivers are for the purpose of authorizing [recipients] to operate a DBE program that achieves the objectives of [the Program] by means that may differ" from the existing requirements.  *Id.*

Recipients are also required to monitor for overconcentration of DBEs within particular types of work in their localities.  Specifically, the regulations provide that if a recipient determines that an overconcentration of DBE firms in a certain type of work is "unduly burden[ing] the opportunity of non-DBE firms to participate in" that type of work, the recipient "must devise appropriate measures to address this overconcentration." 49 C.F.R. § 26.33(a).

> These measures may include the use of incentives, technical assistance, business development programs, mentor-protégé programs, and other appropriate measures designed to assist DBEs in performing work outside of the specific field in which [the recipient has] determined that non-DBEs are unduly burdened. [The recipient] may also consider varying [its] use of contract goals, to the extent consistent with § 26.51, to [e]nsure that non-DBEs are not unfairly prevented from competing for subcontracts.

49 C.F.R. § 26.33(b). Recipients are required to seek federal approval of their overconcentration determination as well as any measures they devise to address the problem. 49 C.F.R. § 26.33(c). Once approved, the measures become part of the recipients' DBE Programs. *Id.*

## B.     Reasons for the Program and Evidentiary Support

The DBE Program is aimed at, among other goals, "ensur[ing] nondiscrimination in the award and administration of DOT-assisted contracts," "creat[ing] a level playing field on which DBEs can compete fairly for DOT-assisted contracts," and "help[ing remove barriers to the participation of DBEs in DOT-assisted contracts." 49 C.F.R. § 26.1(a)-(b), (e). The Program also has a goal of "provid[ing] appropriate flexibility to recipients of Federal financial assistance in establishing and providing opportunities for DBEs." 49 C.F.R. § 26.1(g).

The 2012 reenactment of the DBE Program states that "while significant progress has occurred due to the establishment of the disadvantaged business enterprise program, discrimination and related barriers continue to pose significant obstacles for minority- and women-owned businesses seeking to do business in federally-assisted surface transportation markets across the United States." Pub. L. No. 112-141, § 1101(b)(1)(A).

In each reauthorization of the DBE Program, Congress has considered a plethora of evidence documenting the continued presence of discrimination in transportation projects utilizing federal dollars.  Specifically, in reauthorizing the most current version of the DBE Program, Congress held at least forty hearings and roundtables to discuss the discrimination faced by minority- and women-owned businesses, and

> received and reviewed testimony and documentation of race and gender discrimination from numerous sources, including congressional hearings and roundtables, scientific reports, reports issued by public and private agencies, news stories, reports of discrimination by organizations and individuals, and discrimination lawsuits, which show that race- and gender-neutral efforts alone are insufficient to address the problem.

Pub. L. No. 112-131, § 1101(b)(1)(C).

Additionally, the Federal Defendants submitted an expert report from Dr. Jon Wainright, an economist and Senior Vice President at NERA Economic Consulting explaining the prevalence of discrimination against minority- and women-owned businesses.  (Decl. of Andrew Braniff, Ex. A, June 14, 2013, Docket No. 78.)  Dr. Wainwright's report reviewed 95 studies conducted by 127 public agencies or governments in determining that discrimination against minority- and women-owned businesses is still prevalent in public contracting.  (*Id.*, Ex. A at 9-10.)[2]  Based on these studies, Dr. Wainwright concluded that minorities and women form businesses at disproportionately lower rates and their businesses earn statistically less than businesses owned by men or non-minorities.  (*Id.*, Ex. A at 9-10, 50-67.)  Dr. Wainwright also described the studies supporting the conclusion that there is credit discrimination against

---

[2] Unless otherwise noted, references to page numbers of the parties' exhibits refer to the CMECF pagination.

minority- and women-owned businesses.  (*Id.*, Ex. A at 67-70.)  Dr. Wainwright additionally concluded that there is a consistent and statistically significant underutilization of minority- and women-owned businesses in public contracting, (*id.*, Ex. A at 26-45) and specifically found that discrimination existed in MnDOT contracting when no race-conscious efforts were utilized (*id.*, Ex. A at 39).

## II.     THE MNDOT DBE PROGRAM

MnDOT receives approximately $667.1 million per year in federal transportation funding.  (Aff. of Alex Tittle ¶ 1, June 14, 2013, Docket No. 84.)  Between 2007 and 2011, MnDOT awarded over $3 billion to prime contractors for highway construction work.  (Aff. of Ashanti Payne, Ex. B at 9, June 14, 2013, Docket No. 85.)  Of that award, 99.8 percent of the prime contract dollars were awarded to non-DBE prime contractors and 0.2 percent to DBE prime contractors.  (*Id.*)  Of the total dollars awarded, $1.2 billion was subcontracted by prime contractors, with 13.5 percent of those subcontracted dollars going to DBE subcontractors and 86.5 percent to non-DBE subcontractors.  (*Id.*)  Considering prime and subcontractors together, DBEs received 5.4 percent of total contract dollars awarded by MnDOT from 2007 to 2011.  (*Id.*)

### A.     Aspirational Goals and Methods

In 2005 MnDOT retained National Economics Research Associates Inc. ("NERA") to perform a study analyzing MnDOT's compliance with USDOT regulations. (Payne Aff., Ex. A.)  MnDOT used this study in setting its annual aspirational goal of 15.3 percent for fiscal year 2009.  (Payne Aff. ¶ 6, Ex. D ("Myers Technical Report") at

110.)   The DBE participation rate actually achieved during fiscal year 2009 was 3.6 percent.  (Payne Aff. ¶ 6.)

For fiscal years 2010 through 2012, MnDOT used a number of federally approved methods to ascertain its aspirational goal, and set its goal at 8.7 percent DBE participation.  (*Id.* ¶ 7; Myers Technical Report at 110.)   Actual DBE participation was 5.6 percent in 2010, 7.6 percent in 2011, and 6.6 percent in 2012.  (Payne Aff. ¶ 7.)

For fiscal years 2013 to 2015 MnDOT retained the University of Minnesota Roy Wilkins Center to study MnDOT's contracting market and recommend aspirational goals based on its findings.  (Payne Aff., Ex. B ("2013-2015 Goals Report").)  The 2013-2015 Goals Report prepared by Samuel Myers found a base goal of 8.2 percent, which it adjusted for discrimination to yield an overall goal of 11.4 percent DBE participation. (2013-2015 Goals Report at 8.)   The Report recommended that 2.8 percent of the aspirational goal be met through race-neutral means, with contract goals yielding the remaining 8.6 percent.  (*Id.*)

In adjusting for discrimination, the 2013-2015 Goals Report used two methods to detect market discrimination and found discrimination against DBEs in MnDOT contracting.  (*Id.* at 14-15, 32-35.)  The first method computed the percentage difference in contract amounts that cannot be explained by relevant characteristics of the firm, the contract, or the industry.  (*Id.* at 14.)   The second method separately estimated the contract amounts to DBEs and non-DBEs and computed the amount that DBEs would have received had they been treated like equally situated non-DBEs.  (*Id.* at 15.)

- 14 -

Plaintiffs submitted an expert report from Carl Hubbard that concluded there was no statistically significant discrimination against DBEs based upon the data in the 2013-2015 Goals Report.  (*See* Aff. of Hannah R. Stein, Ex. C ("Hubbard Rebuttal Report") at 8-14, July 5, 2013, Docket No. 89.)   Hubbard also critiqued the 2013-2015 Goals Report's reliance on the use of multiple different approaches to ascertain the availability of DBEs and its measurement of discrimination in both prime and subcontracting markets, instead of solely in subcontracting markets.  (Hubbard Rebuttal Report at 5-8.)  Hubbard ultimately concluded that a goal of 4.38 percent DBE participation would be appropriate.  (Stein Aff., Ex. D ("Hubbard Supplemental Report") at 10-11.)   Myers responded to Hubbard's report by running the regressions suggested by Hubbard and found that it did not decrease the finding of discrimination in MnDOT contracting. (Payne Aff., Ex. E ("Myers Rebuttal Report") at 2-3, 15-24.)

## B.    Overconcentration

MnDOT monitors its DBE Program for overconcentration within discreet work areas.  (Payne ¶ 13.)  MnDOT's Interim Director at the MnDOT Office of Civil Rights avers that "MnDOT has not determined that overconcentration exists in the type of work done by Geyer Signal, Inc. . . .  If MnDOT found such overconcentration and it reached a level of unduly burdening non-DBEs, MnDOT would implement remedial measures per the federal regulations."  (Tittle Aff. ¶ 2.)

The State Defendants' expert, Myers, reviewed the areas of work in which Plaintiffs compete to determine whether overconcentration exists.  (Payne Aff., Ex. C

("Myers Initial Report").)  Myers began by examining four different industry definitions that could fit Plaintiffs' type of work, since no single North American Industry Classification System (NAICs) code applies to what Plaintiffs self-define as Geyer Signals' type of work.  (Myers Initial Report at 9-11.)  Myers then conducted a disproportionality statistical comparison, explaining that "overconcentration of DBEs in a sub-industry requires that there be a disproportionate representation of DBEs in the sub-industry relative to the overall industry.  A disproportionate representation occurs when the disproportionately ratio exceeds one."  (*Id.* at 14.)  Based on this statistical study, Myers concluded that "given the relatively small disproportionality ratios and the abundance of disproportionality ratios that are less than one . . . there is no consistent evidence of overconcentration in the [four industry areas sampled] in which MnDOT contracts."  (*Id.* at 16.)

Plaintiffs' expert Hubbard opined that overconcentration does exist in the areas of traffic control and trucking.  (Hubbard Supplemental Report at 2-8.)  Hubbard analyzed overconcentration based upon a list of seven firms supplied by Plaintiffs, which Plaintiffs believe to be in the same construction field as Geyer Signal.  (*Id.* at 4.)  Hubbard concluded that more DBEs (two of the seven, or 28.6 percent) are working in Plaintiffs' area of work than in other construction fields.  (*Id.*)  Additionally, Hubbard concluded that DBE businesses in the traffic control area of work receive 37 percent of the contract dollars awarded to firms in the traffic control market.  (*Id.* at 5.)  Hubbard also found that the percentage of contracts awarded to DBE firms in the traffic control market was 23.6 percent, which exceeded the overall 20.9 percent of contracts awarded to DBE

subcontractors in MnDOT construction as a whole. (*Id.* at 6.) Furthermore, Hubbard opined that traffic control work makes up 3.2 percent of MnDOT dollars that are subcontracted, but makes up 8.8 percent of total DBE subcontracting dollars, suggesting overconcentration. (*Id.* at 6.)

With respect to Hubbard's description of the relevant market for measuring overconcentration, Myers explained that the NAICs codes he used in his analysis were the very codes reported by Geyer Signal and his self-identified competitors. (Myers Rebuttal Report at 25.) Myers further explained:

> Professor Hubbard claims that certain firms, such as electrical contractors, do not compete in the work zone, traffic safety and signaling industry. And, it is certainly possible that certain firms on the list used to produce industry definitions 1-4 have not previously undertaken such work. This does not mean that such firms are unable to perform such work, nor is it true that such firms are not in competition with firms engaged in work zone traffic safety and signaling work. There is a reason that there is no NAICs code for the work zone traffic safety and signaling industry, an industry that has two large and growing membership organizations: participants in this industry often perform other, related work, including electrical work and rental services of traffic safety devices. To exclude firms in the same **formally recognized census industry codes** in an analysis of concentration in an industry is to conclude incorrectly that the pool of potential competitors is limited to firms that have previously undertaken **public sector (MnDOT)** work zone traffic and safety signaling work. It excludes firms that have or could have competed in **private sector** work zone and traffic safety and signaling work and it excludes firms that may wish to compete in this type of work in the future.

(*Id.* (emphases in original).)

## III. GEYER SIGNAL

Geyer Signal is a family-owned traffic control company that was founded and is majority owned by Kevin Kissner, a white male. (Aff. of Kevin Kissner ¶¶ 1, 3, July 5,

2013, Docket No. 96.)   The traffic control work performed by Geyer Signal involves "setting up and maintaining temporary traffic redirection during road construction," by, among other methods, setting up signs, guardrails, and markings.  (*Id.* ¶ 5.)  Geyer Signal qualifies as small business within the meaning of the Small Business Act, as it earns less than $14 million in annual receipts.  (*Id.* ¶ 4); *see also* 13 C.F.R. § 121.201 (setting the maximum annual receipts for small "highway, street, and bridge construction" businesses at $33.5 million and "all other specialty trade contractors" at $14 million).  Additionally, Kissner's personal net worth is below the $1.32 million threshold for DBE owners. (Kissner Aff. ¶ 4); *see also* 49 C.F.R. § 26.67(a)(2)(i).

Geyer Signal bids annually on approximately 1000 projects.  (Aff. of Richard L. Varco, Jr., Ex. B 77:5-9, June 14, 2013, Docket No. 83.)  Plaintiffs claim that as a result of the DBE Program Geyer Signal has lost bids it otherwise would have obtained as the low bidder, due to the prime contractors' choices to use a more expensive DBE instead. (Kissner Aff. ¶ 6.)  Specifically, Plaintiffs allege that they have lost thirteen bids over the last four years due to operation of the DBE Program.  (*Id.*, Ex. A at 7-8.)  Plaintiffs also claim that "[o]ne of the largest (but almost impossible to quantify) types of damages Geyer has suffered as a result of the DBE Program" is that Plaintiffs have reduced the amount of Geyer Signal's bids "across the board on all projects subject to the DBE Program so that general contractors have a better argument that they do not have to accept a higher DBE bid" because Geyer Signal's bid "is low enough that it would be 'unreasonable' for the general contractor to have to use the higher DBE bid."  (*Id.* ¶ 8.) Kissner admits that "this type of damage is almost impossible to quantify" and thus he

has "not tried to quantify it in this case."  (*Id.*)  Additionally, Kissner avers that "I know that some general contractors have not even bothered to solicit Geyer for work on some projects because they knew that they had to use a DBE to satisfy the 'good faith effort' requirements.  As with Geyer's reduced bid price damages, this type of damages is [sic] very real, but almost impossible to identify or quantify."  (*Id.* ¶ 9.)[3]

With respect to overconcentration and how it impacts Geyer Signal specifically, MnDOT's expert Myers examined undue burden (because federal regulations indicate that overconcentration does not exist unless an "undue burden" is placed on non-DBEs in the specific market).  First, Myers noted that because MnDOT does not often set contract goals on projects involving $500,000 or less, there are ample opportunities for non-DBEs that are situated in these lower overhead fields of construction to bid.  (Myers Initial Report at 16.)  These types of bids constitute about 14 percent of Plaintiffs' bids.  (*Id.* at 16-17.)  Myers also found that "[t]he bid success rates for DBEs and non-DBEs are about the same" on projects with goals.  (*Id.* at 18-19.)  Therefore, Myers concluded that "even if one were to argue that the decline in bid success rates for non-DBEs in the presence of the DBE-Goals program reflects a burden shared by non-DBEs the burden can be justified by the equalization of the bid success rates between DBEs and non-DBEs."  (*Id.* at 18.)  With respect to Plaintiffs' bids specifically, Myers found that

---

[3] The Defendants have collectively brought a motion in limine to exclude this portion (paragraphs 8 and 9) of Kissner's affidavit discussing the damages he has suffered in this case, on the basis that these damages were not included in Plaintiffs' Rule 26 disclosures and also contradict Kissner's deposition testimony.  (Joint Mot. in Limine, July 19, 2013, Docket No. 101.)  Because consideration of this additional evidence does not alter the Court's analysis of Defendants' motions for summary judgment, the Court will deny the motion in limine as moot.

Geyer's bid success rates are higher than DBE success rates. These differences are all statistically significant. When comparing Geyer's bid success rates to DBE bid success rates for contracts with no goals, one finds once again that Geyer[] is not disfavored and does not face a lower success rate for these contracts than that faced by DBEs. Indeed, comparing Geyer to other non-DBEs in the market, Geyer's success rates tend to be considerably higher than the norm.

(*Id.* at 20.)

## IV.   PROCEDURAL HISTORY

Plaintiffs filed an amended complaint on February 17, 2011, alleging that the DBE Program and/or how it is implemented by MnDOT is unconstitutional under the Equal Protection Clauses of the Fifth and Fourteenth Amendments. (*See* Am. Compl., Feb. 17, 2011, Docket No. 4.) Specifically, Plaintiffs allege that there is insufficient evidence of a compelling government interest to support a race based program for DBE use in the fields of traffic control or landscaping. (*Id.* ¶ 37.) Additionally, Plaintiffs allege that the DBE Program is not narrowly tailored because it (1) treats the construction industry as monolithic, leading to an overconcentration of DBE participation in the areas of traffic signal and landscaping work; (2) allows recipients to set contract goals; and (3) sets goals based on the number of DBEs there are, not the amount of work those DBEs can actually perform. (*Id.* ¶¶ 38-41.) Plaintiffs also allege that the DBE Program is unconstitutionally vague because it allows prime contractors to use bids from DBEs that are higher than the bids of non-DBEs, provided the increase in price is not unreasonable, without defining what increased costs are "reasonable." (*Id.* ¶ 43.)

In the amended complaint Plaintiffs seek injunctive and declaratory relief, prohibiting the State Defendants from enforcing the DBE Program or requiring them to administer the Program properly and declaring that the Program, as administered by State Defendants, or on its face, violates the Equal Protection Clauses and is void for vagueness.  Plaintiffs also seeks attorneys' fees and damages under 42 U.S.C. §§ 1981, 1983, and 2000(d), alleging that the State Defendants "have excluded Plaintiffs from participation in, denied Plaintiffs benefits of, and subjected Plaintiffs to discrimination under a program receiving federal financial assistance, on the grounds of Kevin Kissner's race."  (Am. Compl. ¶¶ 52-53.)

After the amended complaint was filed, the Federal Defendants brought a motion to intervene as a matter of right, due to their interest in the challenged federal regulations which are the subject of Plaintiffs claims.  (Mot. to Intervene, Apr. 25, 2011, Docket No. 17.)  United States Magistrate Judge Leo I. Brisbois granted the Federal Defendants' motion.  (Order, May 11, 2011, Docket No. 21.)  The Federal Defendants move for summary judgment, and the State Defendants move to dismiss or in the alternative for summary judgment on all of Plaintiffs' claims.

## ANALYSIS

## I.   STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit,

and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).   Summary judgment is appropriate if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "To defeat a motion for summary judgment, a party may not rest upon allegations, but must produce probative evidence sufficient to demonstrate a genuine issue [of material fact] for trial."  *Davenport v. Univ. of Ark. Bd. of Trs.*, 553 F.3d 1110, 1113 (8th Cir. 2009) (citing *Anderson*, 477 U.S. at 247-49).

## II.    CONSTITUTIONAL CLAIMS

The heart of Plaintiffs' claims in this case is that the DBE Program and MnDOT's implementation of it are unconstitutional because the impact of curing discrimination in the construction industry is overconcentrated in particular sub-categories of work. Because DBEs are, by definition, small businesses, Plaintiffs contend that they "simply cannot perform the vast majority of the types of work required for federally-funded MnDOT projects (typically, enormous highway or transit projects)" because they lack the financial resources and expensive equipment necessary to conduct such work.  (Pls.'

Mem. in Opp'n to Fed. Defs.' Mot. for Summ. J. at 2, July 5, 2013, Docket No. 88.)

Specifically, Plaintiffs argue

> As a result, DBEs only compete in certain small areas of MnDOT work, such as traffic control, trucking, and supply – but the DBE goals that prime contractors must meet are spread out over the entire contract. Prime contractors are forced to disproportionately use DBEs in those small areas of work. Non-DBEs in those areas of work (such as Geyer) are forced to bear the entire burden of "correcting discrimination", while the vast majority of non-DBEs in MnDOT contracting have essentially no DBE competition.

(*Id.*) Plaintiffs therefore argue that the DBE Program is not narrowly tailored "because it means that any DBE goals are only being met through a few areas of work on construction projects – burdening non-DBEs in those sectors and not alleviating any problems in other sectors." (*Id.* at 32.)

Plaintiffs bring two facial challenges to the federal DBE Program. Plaintiffs allege that the DBE Program is facially unconstitutional because it is "fatally prone to overconcentration" where DBE goals are met disproportionately in areas of work that require little overhead and capital. (*Id.* at 2.) Second, Plaintiffs allege that the DBE Program is unconstitutionally vague because it requires prime contractors to accept DBE bids even if the DBE bids are higher than those from non-DBEs, provided the increased cost is "reasonable" without defining a reasonable increase in cost.

Plaintiffs also bring three as-applied challenges based on MnDOT's implementation of the Program. First, Plaintiffs contend that MnDOT has unconstitutionally applied the DBE Program to its contracting because there is no evidence of discrimination against DBEs in government contracting in Minnesota.

Second, they contend that MnDOT has set impermissibly high goals for DBE participation.  Finally, Plaintiffs argue that to the extent the federal Program allows MnDOT to correct for overconcentration, it has failed to do so, rendering its implementation of the Program unconstitutional.

### A.   Strict Scrutiny

The parties do not dispute that strict scrutiny applies to the Court's evaluation of the DBE Program, whether the challenge is facial or as-applied.  Strict scrutiny applies to the Program "because the statute employs a race-based rebuttable presumption to define th[e] class of beneficiaries and authorizes the use of race-conscious remedial measures." *Sherbrooke Turf, Inc. v. Minn. Dep't of Transp.*, 345 F.3d 964, 969 (8th Cir. 2003) (citing *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 212-13 (1995)).[4]  Under strict scrutiny, a "statute's race-based measures 'are constitutional only if they are narrowly tailored to further compelling governmental interests.'"  *Id.* (quoting *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003)).

### B.   Facial Challenge Based on Overconcentration

In order to prevail on a facial challenge to a statute, "the challenger must establish that no set of circumstances exists under which the [Program] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).  It is insufficient to render a statute wholly

---

[4] The DBE Program also contains a gender conscious provision, a classification that would be subject to intermediate scrutiny.  *See Nguyen v. I.N.S.*, 533 U.S. 53, 60 (2001); *see also Duckworth v. St. Louis Metro. Police Dep't*, 491 F.3d 401, 406 (8th Cir. 2007).  Because race is also used by the DBE Program, however, the Program must ultimately meet strict scrutiny, and the Court therefore analyzes the entire Program for its compliance with strict scrutiny.

invalid for a challenger to demonstrate that the statute in question "might operate unconstitutionally under some conceivable set of circumstances." *Id.*; *see also Sherbrooke Turf, Inc.*, 345 F.3d at 971 ("Appellants' facial challenge to the DBE program requires us to look carefully at DOT's regulations to determine whether they may be constitutionally applied under **any** set of factual circumstances." (emphasis in original)). Facial challenges are disfavored because, among other reasons, such claims "run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied" and "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450-51 (2008) (internal quotation marks omitted). Plaintiffs bear the "ultimate burden to prove that the DBE program is unconstitutional." *Sherbrooke Turf, Inc.*, 345 F.3d at 970.

### 1.  Compelling Government Interest

Under strict scrutiny review, "the government must first articulate a legislative goal that is properly considered a compelling government interest." *Id.* at 969. The Eighth Circuit has held that "'the federal government has a compelling interest in not perpetuating the effects of racial discrimination in its own distribution of federal funds and in remediating the effects of past discrimination in the government contracting

- 25 -

markets created by its disbursements.'" *Id.* (quoting *Adarand Constructors, Inc. v. Slater*, 228 F.3d 1147, 1165 (10th Cir. 2000)); *see also W. States Paving Co. v. Wash. State Dep't of Transp.*, 407 F.3d 983, 991 (9th Cir. 2005) ("The federal government has a compelling interest in ensuring that its funding is not distributed in a manner that perpetuates the effects of either public or private discrimination within the transportation contracting industry." (citing *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 492 (1989)). Plaintiffs do not dispute that remedying discrimination in federal transportation contracting is a compelling government interest. Therefore, the Court concludes that Defendants have articulated a compelling interest underlying enactment of the DBE Program.

Second, the government "must demonstrate a 'strong basis in the evidence' supporting its conclusion that race-based remedial action was necessary to further" the compelling interest. *Sherbrooke Turf, Inc.*, 345 F.3d at 969; *see also Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 277 (1986). In assessing the evidence offered in support of a finding of discrimination the Court considers "both direct and circumstantial evidence, including post-enactment evidence introduced by defendants as well as the evidence in the legislative history itself." *Adarand Constructors, Inc.*, 228 F.3d at 1166. The party challenging the constitutionality of the DBE Program bears the burden of demonstrating that the government's evidence did not support an inference of prior discrimination. *Id.* (citing *Concrete Works of Co., Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1522 (10th Cir. 1994)).

Plaintiffs argue that the evidence relied upon by Congress in reauthorizing the DBE Program contains evidence of discrimination facing DBEs that has "nothing to do with any discrimination in actual contracting" such as discrimination in lending. (Pls.' Mem. in Opp'n to Fed. Defs.' Mot. for Summ. J. at 26 (emphases omitted).) Additionally, Plaintiffs generally critique the expert reports, studies, and evidence from the Congressional record produced by the Federal Defendants, explaining:

> It should be noted that the evidence the federal government has produced to support the DBE program is extremely flawed.  The federal government inundates the court and opposing parties with hundreds of studies from different areas of the country (the vast majority of which have **absolutely nothing** to do with Minnesota).  Any examination of these studies shows that they are by and large shoddily done [and] replete with . . . poor scientific method . . . .

(*Id.* at 31 n.18 (emphasis in original).)  But Plaintiffs do not raise any specific issues with respect to Federal Defendants' proffered evidence of discrimination, noting that "no party (including Plaintiffs herein) [could] ever afford to retain an expert to analyze all these studies, which each tend to be hundreds of pages long, and find all of the flaws." (*Id.*)

The Court concludes that neither of Plaintiffs' contentions establishes that Congress lacked a substantial basis in the evidence to support its conclusion that race-based remedial action was necessary to address discrimination in public construction contracting.  Plaintiffs' argument that Congress found multiple forms of discrimination against minority- and women-owned business does not show that Congress failed to also find that such businesses specifically face discrimination in public contracting, or that such discrimination is not relevant to the effect that discrimination has on public contracting.  (*See* Braniff Decl., Ex. A at 26-45); *see also Adarand Constructors, Inc.*,

228 F.3d at 1175-76 (finding evidence relevant to Congressional enactment of a DBE Program to include "that both race-based barriers to entry and the ongoing race-based impediments to success faced by minority subcontracting enterprises . . . are caused either by continuing discrimination or the lingering effects of past discrimination on the relevant market"). *Adarand Constructors, Inc.* further explained that

> the evidence presented by the government in the present case demonstrates the existence of two kinds of discriminatory barriers to minority subcontracting enterprises, **both** of which show a strong link between racial disparities in the federal government's disbursements of public funds for construction contracts and the channeling of those funds due to private discrimination. The first discriminatory barriers are to the formation of qualified minority subcontracting enterprises due to private discrimination, precluding from the outset competition for public construction contracts by minority enterprises. The second discriminatory barriers are to fair competition between minority and non-minority subcontracting enterprises, again due to private discrimination, precluding existing minority firms from effectively competing for public construction contracts.

228 F.3d at 1167-68 (emphasis added). Accordingly, the Court finds that Congress' consideration of discriminatory barriers to entry for DBEs as well as discrimination in existing public contracting establish a strong basis in the evidence for reauthorization of the DBE Program.

Additionally, Plaintiffs' general critique of the methodology of the studies relied upon is similarly insufficient to demonstrate that Congress lacked a substantial basis in the evidence. *See Adarand Constructors, Inc.*, 228 F.3d at 1175 (rejecting Plaintiffs' "characterization of various congressional reports and findings as conclusory and its highly general criticism of the methodology of numerous 'disparity studies' cited by the government and its amici curiae as supplemental evidence of discrimination"). Similarly,

the Eighth Circuit has already rejected Plaintiffs' argument that Congress was required to find specific evidence of discrimination in Minnesota in order to enact the national Program. *See Sherbrooke Turf, Inc.*, 345 F.3d at 970-71 ("If Congress or the federal agency acted for a proper purpose and with a strong basis in the evidence, the program has the requisite compelling government interest nationwide, even if the evidence did not come from or apply to every State or locale in the Nation. Thus, we reject appellants' contention that their facial challenges to the DBE Program must be upheld unless the record before Congress included strong evidence of race discrimination in construction contracting **in Minnesota and Nebraska**." (emphasis in original)).

Finally, despite their apparent disagreement with the evidence presented by the Federal Defendants and that considered by Congress, Plaintiffs have "failed to present affirmative evidence that no remedial action was necessary because minority-owned small businesses enjoy non-discriminatory access to and participation in highway contracts. Thus, they failed to meet their ultimate burden to prove that the DBE program is unconstitutional on this ground." *Id.* at 970. Therefore, the Court concludes that Plaintiffs have not met their burden of raising a genuine issue of material fact as to whether the government met its evidentiary burden in reauthorizing the DBE Program, and summary judgment in favor of the Federal Defendants with respect to the government's compelling interest is appropriate.

## 2.  Narrowly Tailored

Courts examine several factors in determining whether race-conscious remedies are narrowly tailored, including "the necessity for the relief and the efficacy of alternative remedies; the flexibility and duration of the relief, including the availability of waiver provisions; the relationship of the numerical goals to the relevant labor market; and the impact of the relief on the rights of third parties."  *United States v. Paradise*, 480 U.S. 149, 171 (1987).  Numerous federal courts have already concluded that the DBE Program is narrowly tailored, finding that the Program "place[s] strong emphasis on the use of race-neutral means to increase minority business participation in government contracting," offers "substantial flexibility" to states implementing the Program, ties goals for DBE participation to the relevant labor markets through its flexible goal setting processes, and minimizes its race-based nature by directing its benefits "at all small businesses owned and controlled by the socially and economically disadvantaged."  *See Sherbrooke Turf, Inc.*, 345 F.3d at 971-73 (internal quotation marks omitted); *W. States Paving Co.*, 407 F.3d at 995 ("Overall, [the DBE Program] possess[es] all the features of a narrowly tailored remedial program: Race conscious remedies are used only when race-neutral means prove ineffective, these race-conscious measures are employed in a flexible manner and for a limited duration, and the program is tied to the labor market in each State and is designed to minimize the burden on non-minorities."); *Adarand Constructors, Inc.*, 228 F.3d at 1177-87.

Plaintiffs do not dispute the various aspects of the DBE Program that courts have previously found to demonstrate narrow tailoring.  Instead, Plaintiffs argue only that the DBE Program is not narrowly tailored on its face because

> If the recipients use overall industry participation of minorities to set goals, yet limit actual DBE participation to only defined small business that are limited in the work they can perform, there is no way to avoid overconcentration of DBE participation in a few, limited areas of MnDOT work. . . .

> Small business simply cannot and will never be able to perform most of the types of work needed or work on the scale necessary for large highway projects.  If they had the capital to do it, they would not be small businesses.  Therefore, the DBE program will always be overconcentrated.

(Pls.' Mem. in Opp'n to Fed. Defs.' Mot. for Summ. J. at 33, 37.)  To prevail on this facial challenge, Plaintiffs must establish that the overconcentration it identifies is unconstitutional and that there are no circumstances under which the DBE Program could be operated without overconcentration.  The Court will assume, without deciding, that some types of overconcentration could violate the Equal Protection Clause, because Plaintiffs' claim fails on the basis that there are circumstances under which the DBE Program could be operated without overconcentration.

First, Plaintiffs fail to establish that Program goals will always be fulfilled in a manner that creates overconcentration, because they misapprehend the nature of the goal setting mandated by the DBE Program.  Plaintiffs seem to believe that recipients of federal funds set goals for DBE participation based on "overall industry participation of minorities" and then limit achievement of the goals to DBE entities.  (*See id.* at 33.)  But recipients actually set goals for **DBE participation** "based on demonstrable evidence of

the availability of ready, willing and able DBEs relative to all businesses ready, willing and able to participate on . . . DOT-assisted contracts." 49 C.F.R. § 26.45(b). The recipient's goal must reflect its "determination of the level of DBE participation you would expect absent the effects of discrimination." *Id.* Because recipient's goals are based on the availability of DBEs in a local market it is unsurprising, and indeed, a requirement of the Program, that those goals be met with DBE participation. Therefore, the DBE Program necessarily takes into account, when determining goals, that there are certain types of work that DBEs may never be able to perform because of the capital requirements. In other words, if there is a type of work that no DBE can perform, there will be no "demonstrable evidence of the availability of ready, willing and able DBEs" in that type of work and those non-existent DBEs will not be factored into "the level of DBE participation" that a locality would expect absent the effects of discrimination. 49 C.F.R. § 26.45(b).

Second, even if the DBE Program could have the incidental effect of overconcentration in particular areas – for example if fifty DBEs in a given locality are distributed equally across ten different types of construction work, but all of a state's DBE contracts are received by five of those DBEs concentrated in one type of work – the DBE Program facially provides ample mechanisms for a recipient of federal funds to address such a problem. First, a recipient retains substantial flexibility in setting individual contract goals and specifically may consider "the type of work involved, the location of the work, and the availability of DBEs for the work of the particular contract."

49 C.F.R. § 26.51(e)(2).[5] If overconcentration presents itself as a problem a recipient can alter contract goals to focus less on contracts that require work in an already overconcentrated area and instead involve other types of work where overconcentration of DBEs is not present.   The federal regulations also require contractors to engage in good faith efforts which require "breaking out the contract work items into economically feasible units to facilitate DBE participation."   49 C.F.R., pt. 26, App. A, IV.   Therefore the regulations anticipate the possible issue identified by Plaintiffs and require prime contractors to subdivide projects that would otherwise typically require more capital or equipment than a single DBE can acquire.   Additionally, recipients may obtain waivers of the DBE Program's provisions pertaining to overall goals, contract goals, or good faith efforts, if, for example, local conditions of overconcentration threaten operation of the Program.   *See* 49 C.F.R. § 26.15(b); (*see also* Second Decl. of Andrew Braniff, Ex. A ¶ 8, July 19, 2013, Docket No. 100).

　　　With respect to overconcentration specifically, the federal regulations provide that recipients may use "incentives, technical assistance, business development programs,

---

[5] Plaintiffs also cite 49 C.F.R. § 26.45(h) which provides that recipients of federal transportation funds are not allowed to subdivide their annual goals into "group-specific goals" but rather must "provide for participation by all certified DBEs" as evidence that the DBE Program leads to overconcentration.   Plaintiffs interpret this provision to mean that recipients cannot set specific goals for areas of the construction industry.   However, other courts have interpreted this provision to mean that recipients cannot apportion its DBE goal among different minority groups (such as requiring 5% of contracts to be awarded to DBEs controlled by Black Americans, 3% by Hispanic Americans, etcetera).   *See W. States Paving Co.*, 407 F.3d at 990. Therefore, the provision does not appear to prohibit recipients from identifying particular overconcentrated areas and remedying overconcentration in those areas.   Even if the provision operated as Plaintiffs suggest, however, that provision, like many other aspects of the DBE Program, is subject to waiver and does not affect a recipient's ability to tailor specific contract goals to combat overconcentration.   (*See* Second Decl. of Andrew Braniff, Ex. A ¶ 8, July 19, 2013, Docket No. 100.)

mentor-protégé programs, and other appropriate measures designed to assist DBEs in performing work outside of the specific field in which [the recipient] has determined that non-DBEs are unduly burdened." 49 C.F.R. § 26.33(b). All of these measures could be used by recipients to shift DBEs from areas in which they are overconcentrated to other areas of work. Because the DBE Program provides numerous avenues for recipients of federal funds to combat overconcentration, the Court concludes that Plaintiffs' facial challenge to the Program fails, and will grant the Federal Defendants' motion for summary judgment.

### C.    Unconstitutionally Vague

Plaintiffs argue that the DBE Program is facially unconstitutionally vague because it does not define "reasonable" for purposes of when a prime contractor is entitled to reject a DBEs' bid on the basis of price alone. *See* 49 C.F.R., pt. 26, App. A, IV, D(2) ("Prime contractors are not, however, required to accept higher quotes from DBEs if the price difference is excessive or unreasonable."). "A statute is unconstitutional for vagueness if it fails to provide adequate notice of the proscribed conduct or lends itself to arbitrary enforcement." *United States v. Tebeau*, 713 F.3d 955, 961 (8th Cir. 2013) (alteration and internal quotation marks omitted).

Plaintiffs cannot maintain a facial challenge against the DBE Program for vagueness, as their constitutional challenges to the Program are not based in the First Amendment. "It is well established that vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case

at hand." *United States v. Mazurie*, 419 U.S. 544, 550 (1975). In such cases, courts must judge the statute "on an as-applied basis." *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988). Therefore, the Eighth Circuit has held that courts need not consider facial vagueness challenges based upon constitutional grounds other than the First Amendment. *See Gallagher v. City of Clayton*, 699 F.3d 1013, 1021-22 (8th Cir. 2012) ("Because Gallagher concedes he is only asserting a facial challenge to the Ordinance, his claim, the City Manager's discretion renders the Ordinance void for vagueness on due process grounds, is not properly before this court."). Consequently, the Court will grant Federal Defendants' motion for summary judgment with respect to Plaintiffs' facial claim for vagueness.

### D.     As-Applied Challenges[6]

Plaintiffs bring three as-applied challenges against MnDOT's implementation of the federal DBE Program, alleging that MnDOT has failed to support its implementation of the Program with evidence of discrimination in its contracting, sets inappropriate goals for DBE participation, and has failed to respond to overconcentration in the traffic control industry.

---

[6] The Court notes that the State Defendants filed a motion to dismiss or, in the alternative, a motion for summary judgment. Because discovery has been completed, the State Defendants rely heavily on documents not included in the Amended Complaint, and Plaintiffs have responded as if the motion was one for summary judgment, the Court considers the motion as one for summary judgment. *See* Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.").

### 1.   Failure to Find Evidence of Discrimination

In *Sherbrooke Turf, Inc.*, the Eighth Circuit analyzed the existence of evidence of discrimination in Minnesota to determine whether MnDOT's implementation of the federal DBE Program was narrowly tailored.   345 F.3d at 971 ("[T]o be narrowly tailored, a **national** program must be limited to those parts of the country where its race-based measures are demonstrably needed.   To the extent the federal government delegates this tailoring function, a State's implementation becomes critically relevant to a reviewing court's strict scrutiny." (emphasis in original)).   To show that a state has violated the narrow tailoring requirement of the Program, a challenger must demonstrate that "better data was available" and the recipient of federal funds "was otherwise unreasonable in undertaking [its] thorough analysis and in relying on its results."   *Id.* at 973.

Plaintiffs' expert Hubbard critiques the statistical methods used and conclusions drawn by Myers in finding that discrimination against DBEs exists in MnDOT contracting sufficient to support operation of the DBE Program.   Additionally, Hubbard critiques the measures of DBE availability employed by Myers and the fact that he measured discrimination in both prime and subcontracting markets, instead of solely in subcontracting markets.

The Court finds that these disputes with MnDOT's conclusion that discrimination exists in public contracting are insufficient to establish that MnDOT's implementation of the DBE Program is not narrowly tailored.   First, it is insufficient to show that "data was susceptible to multiple interpretations," instead, plaintiffs must "present affirmative

evidence that no remedial action was necessary because minority-owned small businesses enjoy non-discriminatory access to and participation in highway contracts." *Sherbrooke Turf, Inc.*, 345 F.3d at 970.   Here, although Hubbard disagrees with Myers' use and interpretation of various statistical methods, he has not presented affirmative evidence upon which the Court could conclude that no discrimination exists in Minnesota's public contracting.

As for the measures of availability and Myers' measurement of discrimination in both prime and subcontracting markets, both of these practices are included in the federal regulations as part of the mechanisms for goal setting.   *See* 49 C.F.R. § 26.45(a)(1) ("[Y]ou must set an **overall goal** for DBE participation in your DOT-assisted contracts." (emphasis added)); *N. Contracting, Inc. v. Illinois*, 473 F.3d 715, 723 (7th Cir. 2007) (noting that under the federal regulations "[i]t would make little sense to separate prime contractor and subcontractor availability as suggested by NCI when DBEs will also compete for prime contracts and any success will be reflected in the recipient's calculation of success in meeting the overall goal").   Because these factors are part of the federal regulations defining state goal setting that the Eighth Circuit has already approved in assessing MnDOT's compliance with narrow tailoring in *Sherbrooke Turf*, these criticisms do not establish that MnDOT has violated the narrow tailoring requirement. *See Sherbrook Turf*, 345 F.3d at 973 (finding that Minnesota had made sufficient findings of discrimination under federal regulations requiring almost identical goal setting methods as those critiqued here).   Additionally, these criticisms fail to establish that MnDOT was "unreasonable in undertaking [its] thorough analysis and relying on its

results," *id.*, and consequently do not show lack of narrow tailoring.   Accordingly, the Court will grant the State Defendants' motion for summary judgment with respect to this claim.

### 2.   Inappropriate Goal Setting

Plaintiffs next challenge the aspirational goals MnDOT has set for DBE performance between 2009 and 2015.   As an initial matter, the State Defendants argue that challenges to any goals that existed prior to the present goals in effect from 2013-2015 are moot.   This is so, the State Defendants argue, because they are entitled to sovereign immunity and therefore the only relief Plaintiffs can obtain under § 1983 is prospective injunctive relief and declaratory relief.   *See Fond du Lac Band of Chippewa Indians v. Carlson*, 68 F.3d 253, 255 (8th Cir. 1995) ("[S]uits may be brought in federal court against state officials in their official capacities for prospective injunctive relief to prevent future violations of federal law." (citing *Ex parte Young*, 209 U.S. 123 (1908))). Consequently, they argue, any claims based on prior goals that are no longer in effect can result in no relief and are therefore moot.[7]

"Under Article III of the Constitution, federal court jurisdiction is limited to cases and controversies."   *Americans United for Separation of Church & State v. Prison*

---

[7] The State Defendants also argue that Plaintiffs failed to adequately raise challenges to MnDOT's 2013-2015 goals in its amended complaint, and therefore those goals are not properly before the Court in the present motion for summary judgment.   The Court finds that, although not a model of clarity, the amended complaint contains sufficient allegations to include the challenges it now explicitly raises against the 2013-2015 goals.   (*See, e.g.*, Am. Compl. ¶ 26 (referencing MnDOT's goals generally and alleging "[u]pon information and belief, these goals are not supported by studies showing that they are tailored to remedy discrimination on the project in question").)

*Fellowship Ministries, Inc.*, 509 F.3d 406, 420 (8th Cir. 2007). If the controversy does not exist "throughout the litigation" the case is moot, and the Court lacks jurisdiction to decide the merits of the case. *Id.* at 421. "Voluntary cessation of challenged conduct moots a case . . . only if it is **absolutely** clear that the alleged wrongful behavior could not reasonably be expected to recur." *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 222 (2000) (emphasis in original) (internal quotation marks omitted). But, where "it can be said with assurance that there is no reasonable expectation that the alleged violation will recur, and . . . interim relief or events have completely and irrevocably eradicated the effects of the alleged violation" then claims based on the violation are moot. *St. Louis Fire Fighters Ass'n Int'l Ass'n of Fire Fighters Local 73 v. City of St. Louis*, 96 F.3d 323, 329 (8th Cir. 1996) (internal quotation marks omitted).

Here, the Court finds that the goal setting violations Plaintiffs allege are not the types of violations that could reasonably be expected to recur. Plaintiffs raise numerous arguments regarding the data and methodologies used by MnDOT in setting its earlier goals. But Plaintiffs do not dispute that every three years MnDOT conducts an entirely new analysis of discrimination in the relevant market and establishes new goals. Therefore, disputes over the data collection and calculations used to support goals that are no longer in effect are moot, because even if the Court found Plaintiffs' arguments to be true, Plaintiffs would be entitled to no relief based on such a finding. Accordingly, the Court will consider only Plaintiffs' challenges to the 2013-2015 goals.

Plaintiffs raise the same challenges to the 2013-2015 goals as it does to MnDOT's finding of discrimination – that the goals rely on multiple approaches to ascertain the

availability of DBEs and rely on a measurement of discrimination that accounts for both prime and subcontracting markets. Because these challenges, as explained above, identify only a different interpretation of the data and do not establish that MnDOT was unreasonable in relying on the outcome of Myers' studies, Plaintiffs have failed to demonstrate a material issue of fact related to MnDOT's narrow tailoring as it relates to goal setting.

### 3. Overconcentration

Finally, Plaintiffs argue that MnDOT's implementation of the DBE Program violates the Equal Protection Clause because MnDOT has failed to find overconcentration in the traffic control market and correct for such overconcentration. Here, again, the Court will assume without deciding that simple overconcentration of DBE firms in a particular category of work could constitute a constitutional violation, because Plaintiffs have not shown that MnDOT's assessment of no overconcentration was unreasonable.

MnDOT presented an expert report from Myers that reviewed four different industries into which Plaintiffs' work falls based on NAICs codes that firms conducting traffic control-type work identify themselves by. After conducting a disproportionality comparison, Myers concluded that there was not statistically significant overconcentration of DBEs in Plaintiffs' type of work. Plaintiffs' expert found that there is, in fact, overconcentration, but in doing so Hubbard relied upon six other firms that have previously bid on MnDOT contracts that Plaintiffs believe perform the same type of

work as Geyer Signal. But Plaintiffs have provided no authority for the proposition that the government must conform its implementation of the DBE Program to every individual business' self-assessment of what industry group they fall into and what other businesses are similar. In other words, here, Plaintiffs examined data regarding bids on MnDOT projects and determined there are six other firms sufficiently alike to Geyer Signal that they constitute a discrete "type of work" that must be monitored for overconcentration under the federal regulations. To require the State to respond to and adjust its calculations on account of such a challenge by a single business would place an impossible burden on the government because an individual business could always make an argument that some of the other entities in the work area the government has grouped it into are not alike. This would require the government to run endless iterations of overconcentration analyses to satisfy each business that non-DBEs are not being unduly burdened in its self-defined group, which would be quite burdensome. Furthermore, as Plaintiffs' analysis shows, the addition or subtraction of a single entity from an industry group of seven entities could arm a plaintiff with sufficient statistics to say "DBEs are being favored in my group." Because Plaintiffs have not shown that MnDOT's reliance on its overconcentration analysis using NAICs codes was unreasonable or that overconcentration exists in its type of work as defined by MnDOT, it has not established that MnDOT has violated narrow tailoring by failing to identify overconcentration or failing to address it. Accordingly, the Court will grant the State Defendants' motion for summary judgment with respect to this claim.

### III.    42 U.S.C. § 1981

Plaintiffs also bring a claim under 42 U.S.C. § 1981  Section 1981 provides, in relevant part, that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens."[8]

To prevail on a § 1981 claim, a plaintiff must show (1) membership in a protected class; (2) the intent to discriminate on the basis of race on the part of the defendant; and (3) discrimination interfering with a protected activity (i.e. the making and enforcement of contracts." *Daniels v. Dillard's, Inc.*, 373 F.3d 885, 887 (8th Cir. 2004).

The Court need not decide whether these elements have been met because Plaintiffs' claim is premised entirely on MnDOT's actions taken pursuant to the DBE Program, a federal law.  Courts have uniformly held that § 1981 violations apply only to "nongovernmental discrimination" or actions taken "under color of State law."  *See* 42 U.S.C. § 1981(c); *see, e.g.*, *Dotson v. Friesa*, 398 F.3d 156, 162 (2d Cir. 2005) (holding that § 1981 does not apply to actions taken under color of federal law); *Davis-Warren Auctioneers v. FDIC*, 215 F.3d 1159, 1161 (10th Cir. 2000); *Davis v. U.S. Dep't of Justice*, 204 F.3d 723, 725 (7th Cir. 2000) (per curiam); *Lee v. Hughes*, 145 F.3d 1272, 1277 (11th Cir. 1998).  Because the Court has concluded that MnDOT's actions are in compliance with the federal DBE Program, its adherence to that Program cannot

---

[8] Despite the statute's language, § 1981 can also be invoked by white individuals who can show intentional discrimination on the basis of race.  *See McDonalds v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 286-87 (1976).

constitute a basis for a violation of § 1981.   Accordingly, the Court grants Defendants'
motions for summary judgment on these claims.

## IV.    42 U.S.C. § 2000d

Plaintiffs also bring claims under 42 U.S.C. § 2000d which prohibits
discrimination on the basis of race "under any program or activity receiving Federal
financial assistance."   But this statute provides no greater protection than the Equal
Protection Clause.  *See United States v. Fordice*, 505 U.S. 717, 732 n. 7 (1992) ("Our
cases make clear, and the parties do not disagree, that the reach of Title VI's protection
extends no further than the Fourteenth Amendment.").   Because the Court has already
concluded that Plaintiffs fail to establish a violation of the Equal Protection Clause, it will
also grant Defendants' motions for summary judgment on the § 2000d claim.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS
HEREBY ORDERED** that:

1.     Federal Defendant-Intervenors' Motion for Summary Judgment [Docket
No. 77] is **GRANTED**.   The claims asserted against them in Plaintiffs' Amended
Complaint are **DISMISSED with prejudice**.

2.     State Defendants' Motion to Dismiss/Motion for Summary Judgment
[Docket No. 80] is **GRANTED**.   The claims asserted against them in Plaintiffs'
Amended Complaint are **DISMISSED with prejudice**.

3.      Defendants' Joint Motion in Limine [Docket No. 101] is **DENIED as moot**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


DATED: March 31, 2014                                    _____
at Minneapolis, Minnesota.                                         JOHN R. TUNHEIM
                                                                  United States District Judge